USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/25/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

GRAMERCY ADVISORS, LLC and
GRAMERCY GLOBAL RECOVERY FUND,
LLC,          :

         :

       Plaintiffs,  :

         :

-against-      :

         :

ROBERT RIPLEY, FRANCES RIPLEY, THE  :
ROBERT L. RIPLEY LIVING TRUST, ROBERT :
RIPLEY as trustee for the Robert L. Ripley Living :
Trust, and CARY INVESTMENTS, LLC,  :

         :

       Defendants.  :

----------------------------------------------------------------X

13-CV-9070 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

      In 2000, Defendants – and many others – invested in a tax shelter scheme that the Internal Revenue Service ("IRS") discovered and disallowed.  Plaintiffs played a role in executing Defendants' tax-motivated transactions, although they disclaimed all responsibility for the investment strategy or the tax advice underlying the strategy.  Defendants, who incurred substantial liability to the IRS in connection with the scheme, have sued a number of entities, including Plaintiffs, in Illinois state court for their roles in the unsuccessful tax shelter.  Plaintiffs commenced this lawsuit seeking indemnification and advancement of costs incurred in defending against Defendants' Illinois lawsuit.  Defendants moved to dismiss, asserting lack of subject matter jurisdiction, lack of personal jurisdiction, improper venue, and failure to state a claim.  Defendants' motion is GRANTED IN PART and DENIED IN PART.

# BACKGROUND[1]

In 2000, Robert and Frances Ripley sold a company they co-owned, generating a tax liability of over $8 million.  First Am. Compl. ("FAC") ¶ 11.  Rather than paying the tax, the Ripleys consulted with non-parties BDO Seidman LLP ("BDO") and Jeffer Mangles LLP ("Jeffer") regarding strategies to shelter the income.  *Id.*  Based on the strategy that these companies devised, Robert Ripley (acting for himself and his spouse) created the Robert L. Ripley Living Trust ("Ripley Trust") and Cary Investments LLC.  *Id.* ¶ 12.  Through Cary Investments, the Ripleys retained Plaintiffs to execute transactions that had been designed and directed by BDO and Jeffer.  *Id.* ¶ 13.  Robert Ripley traveled to New York City, where the Plaintiffs' sole office was located, to discuss retaining Plaintiffs.  *Id.*, FAC Ex. C ¶ 28.  After several months the Ripleys retained Plaintiffs through a number of contracts that were signed during the summer of 2000.  FAC ¶ 17, Ripley Aff. ¶ 6.

Robert Ripley, as the Trustee for Cary Investments, and Jay Johnston, on behalf of Gramercy Advisors, signed an Investment Management Agreement ("IMA") on June 16, 2000.  FAC Ex. A.  On August 2, 2000, Robert Ripley (as Managing Member of Cary Investments) executed a Subscription Agreement with Gramercy Global Recovery Fund LLC, through which Cary Investments transferred over $500,000 to Gramercy Global Recovery Fund.  FAC Ex. B.  Gramercy executed the agreements from New York; Ripley executed them from Illinois.  Ripley Aff. ¶¶ 3-4, Lanava Decl. ¶ 5.  Pursuant to these agreements, Plaintiffs provided certain investment management services on the Ripleys' behalf.  FAC ¶ 17.  Plaintiffs provided these services from their New York office.  Lanava Decl. ¶ 6.  In mid-2001, Plaintiffs moved to

---

[1]      The Court presumes the truth of the Complaint's allegations at this stage in the litigation.  *See Meyer v. JinkoSolar Holdings Co., Ltd.*, --- F.3d ---, No. 13-616-cv, *slip op.* at 3, 8 (2d Cir. July 31, 2014).

Connecticut; they provided no further services to the Ripleys after they moved.  The Ripleys terminated their account with Plaintiffs in September 2001.  *Id.* ¶¶ 3, 6.

The overarching theme of the agreements between Plaintiffs and Defendants was that Plaintiffs were taking absolutely no responsibility for the viability of the tax shelter strategy that Defendants were pursuing and that Plaintiffs would be held harmless from any liability (other than that associated with fraud or other intentional misconduct) that might come their way by virtue of their involvement with the tax shelter strategy.  For example, section 7(a) of the IMA provided, *inter alia*:

> [t]o the fullest extent permitted by law, . . . [Plaintiffs] shall not be liable to the [Defendants] for [] any act or omission by [Plaintiffs] in connection with the conduct of the business of [Cary Investments], that is determined by [Plaintiffs] in good faith to be in or not opposed to the best interests of [Cary Investments], unless that act or omission constitutes willful misconduct, gross negligence, a violation of applicable securities laws or criminal wrongdoing . . . [or] any act or omission by [Plaintiffs] based on the suggestions of any professional advisor of [Cary Investments] whom [Plaintiffs] believe[] is authorized to make such suggestions.

FAC Ex. A § 7(a).  Cary Investments further agreed to "indemnify and save harmless" Plaintiffs and their officers and employees "[t]o the fullest extent permitted by law" from any and all claims and to pay defense costs "that are incurred by any Indemnitee and arise out of or in connection with the business of [Cary Investments] or the performance by the Indemnitee of [Plaintiffs'] responsibilities hereunder."  *Id.* § 7(d).  These provisions were to "remain operative and in full force and effect regardless of the expiration or any termination of [the IMA]."  *Id.* § 7(g).

The Gramercy-has-no-exposure-from-this-relationship theme continued in the Subscription Agreement.  In that agreement, the Ripleys also agreed to indemnify Plaintiffs "against any loss, liability, cost or expense (including attorney's fees, taxes and penalties) which may result, directly or indirectly, from any misrepresentation or breach of any warranty,

condition, covenant or agreement set forth herein or in any other document delivered by [Cary Investments] to the Fund."  FAC Ex. B § 4.

Against the overall theme of the agreements that Gramercy would have no exposure and would be fully indemnified by Cary, the final subsection of section seven of the IMA is an outlier.  It provides:  "[n]otwithstanding anything in [the IMA] to the contrary, the aggregate maximum amount that [Cary Investments] shall be liable to Indemnitees pursuant to this Section 7 shall never exceed the asset value of [Cary Investments'] Account on any date that the acts or omissions giving rise to the claim for indemnification shall have occurred."  *Id.* § 7(h).

In 2001, the Ripleys filed their 2000 tax return, which included a $20 million "loss" that had been manufactured through the tax shelter transactions.  FAC ¶ 26.  The IRS rejected the tax strategy and assessed substantial back-taxes, together with more than $1 million in interest and $350,000 in penalties.  FAC Ex. C ¶¶ 24, 47.  In January 2009, the Ripleys and Cary Investments sued BDO, Plaintiffs, Jay Johnston, and others in Illinois state court.   FAC Ex. C.  The Illinois complaint alleges, *inter alia*, causes of action for breach of fiduciary duty, rescission, and fraud. *Id.*

On December 16, 2013, Plaintiffs demanded that Defendants advance them $500,000 for legal fees associated with their defense of the Illinois action and reimburse them for all expenses incurred in defending that action.  FAC ¶ 29.  Defendants did not comply, and Plaintiffs promptly initiated this action alleging that Defendants breached the IMA and the Subscription Agreement and seeking specific performance of Defendants' alleged contractual obligations to advance Plaintiffs' litigation costs and to indemnify and hold them harmless.  Defendants moved to dismiss for lack of subject matter jurisdiction, lack of personal jurisdiction, improper venue, and failure to state a claim.  Br. at 1 (citing Fed. R. Civ. P. 12(b)(1), (2), (3), and (6)).

**DISCUSSION**

## I.     The Court Has Subject Matter Jurisdiction

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a

claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the

district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l*

*Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks and citation

omitted), *aff'd*, 561 U.S. 247 (2010).  In resolving a motion to dismiss for lack of subject matter

jurisdiction under Rule 12(b)(1), courts "must take all uncontroverted facts in the complaint (or

petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction."

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).  "But

'where jurisdictional facts are placed in dispute, the court has the power and obligation to decide

issues of fact by reference to evidence outside the pleadings, such as affidavits.'"  *Id.* (quoting

*APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)).  "A plaintiff asserting subject matter

jurisdiction has the burden of proving by a preponderance of the evidence that it exists."

*Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

Plaintiffs allege the Court has jurisdiction pursuant to Section 1332, which confers

jurisdiction, *inter alia*, over "all civil actions where the amount in controversy exceeds the sum

or value of $75,000, exclusive of interest and costs, and is between citizens of different States."

28 U.S.C. § 1332(a).  The Defendants do not contest that diversity exists (the Plaintiffs are

citizens of New York, Texas and Connecticut; the Defendants are Illinois citizens),[2] but do

challenge the amount in controversy.  Relying on section 7(h) of the IMA, which purports to cap

---

[2]     Both Gramercy Advisors, LLC and Cary Investments, LLC are Delaware limited liability corporations. FAC ¶ 4, FAC Ex. C ¶ 6.  Limited liability corporations are citizens of the states in which their members are citizens. *Carden v. Arkoma Assocs.*, 494 U.S. 185, 189 (1990); *Handelsman v. Bedford Village Assocs. Ltd. P'ship*, 213 F.3d 48, 51-52 (2d Cir. 2000).

recovery at the asset value of Cary Investments' account on the date that the act or omission

occurred giving rise to the claim for indemnification, Defendants argue that their indemnification

is capped at the amount currently on deposit with Plaintiffs, which is $0.00.

Defendants' argument is unpersuasive. The limitation in section 7(h) must be read in the

context of the entire contract. *See Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13

N.Y.3d 398, 404 (2009) ("The entire contract must be reviewed and particular words should be

considered, not as if isolated from the context, but in the light of the obligation as a whole and

the intention of the parties as manifested thereby.") (quotation marks, citation, and alterations

omitted). In section 7(g), the parties agreed that all benefits conferred on Plaintiffs by section

seven should "remain operative and in full force and effect regardless of the expiration or any

termination of this Agreement." FAC Ex. A § 7(g). The IMA itself demonstrates an awareness

that the termination of the Agreement required that the asset value of Defendants' account be

fully discharged. *See id.* § 10(b) (noting the Defendants' right to terminate "is subject to market

conditions permitting [Plaintiffs] to liquidate the Account in a prudent manner"); *see also*

Lanava Decl. ¶ 8. Section 7(g) would be rendered meaningless if the subsequent subsection

were interpreted as Defendants contend to limit the indemnity obligation following termination

of the agreement to the amount that remained in the account at the time. At a minimum the IMA

is ambiguous. Thus, at this stage of the litigation, Plaintiffs have satisfied their obligation to

demonstrate by a preponderance of the evidence that the amount in controversy exceeds $75,000.

*See Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002).

## II.    The Court Has Specific Personal Jurisdiction Over the Defendants

Defendants next argue that the Court lacks personal jurisdiction. "'Prior to trial, [] when

a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written

materials, the plaintiff need only make a prima facie showing.'" *MacDermid, Inc. v. Deiter*, 702

F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)).[3]  "With exceptions not relevant here, a district court sitting in a diversity action such as this may exercise personal jurisdiction to the same extent as the courts of general jurisdiction of the state in which it sits." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002) (citing Fed. R. Civ. P. 4(k)(1)(A)).  Accordingly, the Court engages in a familiar two-step analysis, first determining whether plaintiffs have made a *prima facie* showing that defendants would be subject to personal jurisdiction under the laws of the forum state and then determining whether this exercise of jurisdiction would comport with the Due Process Clause of the Fourteenth Amendment.  *Id.*

"There are two types of personal jurisdiction: specific and general." *Sonera Holding B.V. v. Çukurova Holding A.Ş.*, 750 F.3d 221, 225 (2d Cir. 2014) (*per curiam*).  Plaintiffs here do not allege general personal jurisdiction but assert that the Court has jurisdiction pursuant to N.Y. C.P.L.R. 302(a)(1).  That statute confers personal jurisdiction "over any non-domiciliary . . . who in person or through an agent[] transacts any business within the state or contracts anywhere to supply goods or services in the state."  "[T]o invoke jurisdiction under section 302(a)(1), plaintiff[s] must demonstrate that defendant[s] transacted business within New York State, and that that business had some nexus with this cause of action." *Philipp Bros., Inc. v. Schoen*, 661 F. Supp. 39, 41 (S.D.N.Y. 1987).[4]

---

[3]      To prevail at trial or at a possible subsequent evidentiary hearing, Plaintiffs "will bear the burden of establishing personal jurisdiction over [Defendants] by a preponderance of the evidence." *CutCo Indus. v. Naughton*, 806 F.2d 361, 368 (2d Cir. 1986).

[4]      Defendants do not challenge Plaintiffs' assertion that this cause of action shares a significant nexus with the conduct – negotiation and execution pursuant to the contract – that forms the basis of the FAC.  Br. at 8-9.

Jurisdiction under C.P.L.R. 302(a)(1) may be "proper 'even though the defendant[s] never enter[] New York, so long as the defendant[s'] activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted.'" *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (quoting *Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006)); *see also Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 165 n.3 (2d Cir. 2010). "No single event or contact connecting defendant[s] to the forum state need be demonstrated; rather, the totality of all defendant[s'] contacts with the forum state must indicate that the exercise of jurisdiction would be proper." *CutCo Indus. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). Although this "is an objective inquiry, it always requires a court to closely examine the defendant[s'] contacts for their quality." *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 338 (2012).

The fact that Defendants deliberately engaged a New York entity for the purpose of conducting activities on their behalf in New York may be sufficient for personal jurisdiction under C.P.L.R. 302(a)(1). In *Fischbarg*, California-based defendants engaged Fischbarg, a New York attorney who had an office only in New York, to represent them in an action in Oregon. 9 N.Y.3d at 377-78. The defendants never traveled to New York but spoke with Fischbarg by telephone and email. *Id.* When a dispute over fees arose, Fischbarg brought a collection action in New York against his former clients. In response to their challenge to personal jurisdiction, the Court of Appeals held that the defendants' "New York contacts comprised 'the purposeful creation of a continuing relationship with a New York [entity]'" and therefore found the exercise of personal jurisdiction to be proper. *Id.* at 381 (quoting *George Reiner & Co. v. Schwartz*, 41 N.Y.2d 648, 653 (1977)). Similarly, in *George Reiner*, the Court of Appeals upheld the exercise of personal jurisdiction over a salesman who traveled to New York for an employment interview, obtained a job with the New York company, and then never returned to New York during his

8

four years of employment with the New York company.  41 N.Y.2d at 649.  Although his

intersection with New York was short-lived, it "included interviewing, negotiating and

contracting—the purposeful creation of a continuing relationship with a New York corporation."

*Id.* at 653.

In evaluating a claim of personal jurisdiction under C.P.L.R. 302(a)(1), federal courts

have considered:

> a variety of factors, including: (i) whether the defendant has an on-going contractual
> relationship with a New York corporation; (ii) whether the contract was negotiated
> or executed in New York, and whether, after executing a contract with a New York
> business, the defendant has visited New York for the purpose of meeting with
> parties to the contract regarding the relationship; (iii) what the choice-of-law clause
> is in any such contract; and (iv) whether the contract requires franchisees to send
> notices and payments into the forum state or subjects them to supervision by the
> corporation in the forum state.

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996) (citations

omitted).  Courts have upheld jurisdiction pursuant to C.P.L.R. 302(a)(1) where, as here,

defendants traveled to New York for one preliminary meeting that led to the later formation of a

contract.  *See, e.g., SAS Grp. v. Worldwide Inventions, Inc.*, 245 F. Supp. 2d 543, 549 (S.D.N.Y.

2003); *Chemco Int'l Leasing, Inc. v. Meridian Eng'g, Inc.*, 590 F. Supp. 539, 541-43 (S.D.N.Y.

1984); *but see Hutton v. Priddy's Auction Galleries, Inc.*, 275 F. Supp. 2d 428, 439 (S.D.N.Y.

2003) (declining to exercise jurisdiction over a contract that was negotiated and executed in

Colorado).

Here, Plaintiffs rely on three facts to establish jurisdiction: (1) Ripley attended a meeting

in Manhattan to lay the foundation for the contracts whose breach is at issue; (2) Gramercy

executed the contracts in New York; and (3) Gramercy performed its obligations under the

contracts in New York.  Opp. at 5-6.  The importance of the New York meeting is subject to

some dispute; however, at this stage the Court must draw all inferences in favor of the Plaintiffs.

*CutCo*, 806 F.2d at 364.  Defendants assert that the meeting in New York, which occurred months before the IMA was executed, "was a preliminary meeting at which no documents were signed and no agreements were reached."  Ripley Aff. ¶ 7.  The record does not, however, contain so much as a whisper of other meetings between Defendants and Plaintiffs, who ultimately signed multiple contracts regarding very large-scale transactions.  The Court could draw at least three inferences from the record as it now stands: first, the New York meeting addressed most or all of the details necessary to effect the contracts; second, Defendants called, wrote, or emailed the Plaintiffs in New York to iron out any remaining wrinkles; or third, there were additional contacts, either in person or otherwise, that occurred outside of New York.  Even if the first or second option were not clearly the most likely (they are), the third inference is impermissible, as it interprets the record in a manner more favorable to Defendants.  *Chloé*, 616 F.3d at 163.  The Court also notes that Defendants, to effectuate the transactions contemplated by the IMA and Subscription Agreement, opened an account with Lehman Brothers Commercial Corporation in New York and transferred cash and assets to that New York account (which Plaintiffs used to effectuate the tax shelter transactions).  Lanava Decl. ¶ 7.

The *Agency Rent A Car* factors tilt decidedly in favor of exercising personal jurisdiction in this case.  Defendants indisputably had an ongoing contractual relationship with a New York corporation for the bulk of the relevant time period (although Gramercy was a Connecticut corporation by the time Defendants filed suit).  The record as it stands shows only New York-based contract negotiations, and both the IMA and the Subscription Agreement were executed by Plaintiffs in New York.  Lanava Decl. ¶ 5.  The IMA contains a New York choice-of-law clause.  FAC Ex. A § 14(c).  Finally, Defendants transferred considerable sums of money into New York in order to effectuate transactions pursuant to the contracts that are at issue in this litigation.  Lanava Decl. ¶ 7.  Perhaps each fact standing alone is not as persuasive as it would need to be to

constitute an independent ground for jurisdiction, but the determination of whether the Court has

personal jurisdiction is based on the totality of the circumstances, *Agency Rent A Car*, 98 F.3d at

29, not each individual circumstance.

Defendants have not alleged that this is the "rare" case in which personal jurisdiction is

appropriate under C.P.L.R. 302(a)(1) but not consistent with constitutional due process.  *See*

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013).[5]

Given the totality of the circumstances, at this stage in the case Plaintiffs have made a

*prima facie* case that the court has personal jurisdiction over Defendants.

## III.    Venue Is Proper in the Southern District of New York

In a challenge similar to the motion to dismiss for lack of personal jurisdiction,

Defendants allege that the Court should dismiss the case because New York is an improper

venue.  *See* 28 U.S.C. § 1406(a).  To survive a motion to dismiss for improper venue, as for lack

of personal jurisdiction, prior to trial and any evidentiary hearing, "the plaintiff need only make a

*prima facie* showing of venue."  *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005)

(quoting *CutCo*, 806 F.2d at 364-65) (alteration omitted).[6]  To establish a *prima facie* case,

plaintiffs must show that "'a substantial part' of the underlying events took place in" the district

---

[5]        This case therefore does not require the Court to attempt to reconcile the Second Circuit's caselaw
regarding the interplay of 302(a)(1) and due process.  *Compare Licci*, 732 F.3d at 170 ("[D]espite the fact that
section 302(a)(1) . . . and constitutional due process are not coextensive, and that personal jurisdiction permitted
under the long-arm statute may theoretically be prohibited under due process analysis, we would expect such cases
to be rare."); *with D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006) ("[T]he constitutional
requirements of personal jurisdiction are satisfied because application of N.Y. C.P.L.R. § 302(a) meets due process
requirements.").

[6]        Although *Gulf Insurance* and many other cases interpreting the venue provisions were decided before
Congress passed the Federal Courts Jurisdiction and Venue Clarification Act of 2011, PL 112-63, 125 Stat. 758
(Dec. 7, 2011), that law did not change the language of Section 1391(b)(2), the relevant provision here.  While the
earlier version of the statute had a separate diversity subsection, its part (2) was identical to the current language of
Section 1391(b)(2).

they selected.  *Id.* at 356 (quoting 28 U.S.C. § 1391(b)(2)).[7]  While venue may be proper in more

than one district, the Second Circuit has "caution[ed] district courts to take seriously the

adjective 'substantial.'"  *Id.* at 357.

Defendants argue that venue is inappropriate in this district because the operative events

giving rise to Plaintiffs' complaint did not occur in New York.  They specifically identify (1) the

filing of their Illinois lawsuit and (2) Plaintiffs' issuance of the December 2013 demand letter

seeking reimbursement as the "operative facts" underlying this action.  Br. at 12.  In determining

venue for breach of contract actions, however, courts do not look exclusively to the location of

the breach.  They also look to where the contract was executed, where it was negotiated, and

where parties performed pursuant to the contract.  *Largotta v. Banner Promotions, Inc.*, 356 F.

Supp. 2d 388, 390 (S.D.N.Y. 2005); *see also Gen. Cap. Partners LLC v. Liberty Ridge, LLC*, No.

07-CV-4089(RJS), 2007 WL 3010028, at *2 (S.D.N.Y. Oct. 12, 2007) ("First, the fact that the

underlying contract was at least partially negotiated and executed in New York is, standing

alone, sufficient for this action to proceed in this District.").  The contract negotiations,

Plaintiffs' execution of both relevant contracts, the financial transactions that the Ripleys

undertook through Lehman Brothers, and Gramercy's performance under both contracts, all of

which occurred in New York, is sufficient to make venue appropriate in this District.  *See Cosa*

---

[7]        The venue statute provides that:

A civil action may be brought in—
(1)  a judicial district in which any defendant resides, if all defendants are residents of the State in which
     the district is located;
(2)  a judicial district in which a substantial part of the events or omissions giving rise to the claim
     occurred, or a substantial part of the property that is the subject of the action is situated; or
(3)  if there is no district in which an action may otherwise be brought as provided in this section, any
     judicial district in which any defendant is subject to the court's personal jurisdiction with respect to
     such action.

28 U.S.C. § 1391(b).  Part (1) would make venue proper in any district in Illinois; Part (3) does not apply to this
case.

*Xentaur Corp. v. Bow*, No. 13-CV-2912(JS), 2014 WL 1331030, at *7 (E.D.N.Y. Mar. 31, 2014); *Sacody Techs., Inc. v. Avant, Inc.*, 862 F. Supp. 1152, 1157 (S.D.N.Y. 1994).

Defendants' extensive discussion of *Half Price Books, Records, Magazines, Inc. v. Riepe*, No. 3:98-CV-585-P, 1998 WL 329383 (N.D. Tex. June 12, 1998), is misplaced. In that case, a Northern District of Texas court transferred to the Western District of Washington a lawsuit brought in Texas by a multi-state corporation against a former employee, who had been employed by it in Washington for many years. *Id.* at *1-2, 6. The court specifically noted that "[e]ven if venue was proper in the Northern District of Texas, . . . transfer[] to the Western District of Washington [was appropriate] based on the convenience of the parties." *Id.* at *6. While the contract at issue in that case was provided to the defendant during one of his visits to Texas for corporate meetings, the contract was signed, both parties performed, and the contract was breached in Washington State. *Id.* Plaintiffs here lack the ties to Illinois that the *Half Price* plaintiff had to Washington; Plaintiffs' sole office was in New York during the time that they performed under the contract. Moreover, many of the underlying financial transactions took place in New York.

A court may transfer a case pursuant to 28 U.S.C. § 1404(a) "[f]or the convenience of parties and witnesses, in the interest of justice," even when venue is appropriate in the transferring court (and even when the parties do not request transfer). *See, e.g., Lead Indus. Ass'n v. Occupational Safety and Health Admin.*, 610 F.2d 70, 79-80 n.17 (2d Cir. 1979) (Friendly, J.). There is, however, no requirement that it do so. "The permissive 'may' forecloses [the] argument that the district court 'must'" transfer the case to another appropriate venue. *United States v. Shand*, 739 F.3d 714, 715 (2d Cir. 2014) (*per curiam*). No party seeks to transfer this case, and no factor weighs strongly enough in favor of a different venue for the Court to ignore Plaintiffs' choice of venue.

**IV.     The Ripleys and the Trust Are Properly Named as Defendants**

Defendants move to dismiss claims against Robert and Frances Ripley and the Ripley

Trust arguing that they are not properly named as defendants because the contracts under which

Plaintiffs are suing were signed only on behalf of Cary Investments.  The Court rejects this

argument.

First, Defendants, in their individual capacities and on behalf of Cary Investments, are

suing Plaintiffs in Illinois and allege in that action, *inter alia*, that "[i]n deciding to enter into the

[various contracts involved in the tax shelter scheme ], Plaintiffs relied on numerous material

knowingly false affirmative representations."  FAC Ex. C ¶ 88.[8]  Thus, as plaintiffs the Ripleys

alleged that Gramercy's conduct induced them to become parties to a contract, but when they are

defendants they disclaim being party to the contract.  They cannot have it both ways.  Second,

the FAC in this case adequately alleges that Cary Investments was "'in fact a mere

instrumentality or alter ego its owner[s].'"  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537

F.3d 168, 176 (2d Cir. 2008) (quoting *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del.

Ch. 1992)).  Among other allegations, the Amended Complaint alleges that Robert Ripley, on

behalf of himself and his wife, created the Ripley Trust and Cary Investments to further the

scheme to reduce their tax obligations.  FAC ¶¶ 12-13.  The FAC alleges that "[t]he sole function

of the Trust was to facilitate the tax-avoidance aims of Robert and Frances Ripley."  *Id.* ¶ 15.

Cary Investments, which also "was created pursuant to the Ripley's tax avoidance strategy," *id.*

¶ 16, was owned, controlled, and managed by the Trust, *id.*, and "did not have a corporate

---

[8]      Although this paragraph does not specify that it only applies to the Gramercy parties, on its face it applies
to all defendants in the Illinois action.  FAC Ex. C ¶¶ 87-89.  The record does not suggest that there are other
contracts between the Ripleys and the Gramercy parties to which this language might refer.

existence or purpose aside from facilitating the tax-avoidance aims of Robert and Frances Ripley," *id.*

In support of their motion to dismiss, Defendants rely on cases in which plaintiffs allege that one real, multifaceted corporation was acting on behalf of another. *See, e.g., Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 121 (E.D.N.Y. 2011). Those cases are not apposite. In this case the FAC clearly alleges that the Ripleys established and ran the Trust and Cary Investments exclusively to facilitate their illegal tax transactions. The FAC discusses the creation and the management of both the Trust and Cary Investments. FAC ¶¶ 15-16. This is not a case in which the complaint relies on "'[c]onclusory allegations of 'alter ego' status[, which] are insufficient to state a claim.'" *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, No. 11-CV-4491(PGG), 2013 WL 1294519, at *10 (S.D.N.Y. Mar. 30, 2013) (quoting *Neilson v. Union Bank of Ca., N.A.*, 290 F. Supp. 2d 1101, 1116 (C.D. Cal. 2003)).

Defendants' motion to dismiss the non-Cary Investments Defendants is, therefore, denied.

### V.     Plaintiffs State a Plausible Claim on Which Relief Could Be Granted

Finally, Defendants move to dismiss several counts of the FAC for failure to state a claim pursuant to Rule 12(b)(6). "At this stage, dismissal is appropriate only where [Plaintiffs] can prove no set of facts consistent with the complaint that would entitle them to relief." *Meyer v. JinkoSolar Holdings Co., Ltd.*, --- F.3d ---, No. 13-616-cv, *slip op.* at 9 (2d Cir. July 31, 2014). "Under *Ashcroft v. Iqbal*, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face' to survive a motion to dismiss." *Nielsen v. AECOM Tech. Corp.*, --- F.3d ---, No. 13-235-cv, *slip op.* at 7-8 (2d Cir. Aug. 8, 2014) (quoting *Iqbal*, 556 U.S. 662, 678 (2009)). "In certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6). Documents that

are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

### A.  First Cause of Action – Breach of the IMA

Plaintiffs' first cause of action makes three distinct breach of contract claims.  It contends that Defendants breached by: failing to indemnify Plaintiffs for the Illinois suit, FAC ¶ 36; failing to provide Plaintiffs with an advance to cover the immediate costs of that litigation, *id.*; and suing, in breach of the IMA's covenant not to sue, *id.* ¶ 35.  Defendants challenge each, alleging that (1) section 7(h) of the IMA precludes recovery for indemnification pursuant to section seven; (2) the contract is not "unmistakably clear" so as to require advancement of costs and indemnification for inter-party suits; (3) the Illinois lawsuit alleges fraud, which is excluded from the indemnification provision; and (4) the IMA does not contain a covenant not to sue.

"[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013) (quoting *Greenfield v. Phillies Records*, 98 N.Y.2d 562, 569 (2002)). "'[A]mbiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 53 (2d Cir. 2012) (quoting *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003)).  "When reviewing competing interpretations of contractual language, courts 'need not determine which is the more likely interpretation,' but instead 'merely decide whether each is sufficiently reasonable to render the clause ambiguous.'" *CP III Rincon Towers, Inc. v. Cohen*, --- F. Supp. 2d ---, No. 10-CV-

4638(DAB), 2014 WL 1357323, at *10 (S.D.N.Y. Apr. 7, 2014) (alterations omitted) (quoting *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115 (2d Cir. 1994)). To survive Defendants' Rule 12(b)(6) motion to dismiss, Plaintiffs must only show that the language of the IMA is ambiguous and that at least one reasonable reading entitles them to relief. *Bayerische Landesbank*, 692 F.3d at 56.

        **1.    Section 7(h) does not unambiguously preclude recovery under the IMA.**

      Defendants' argument that section 7(h) bars recovery under the IMA is unpersuasive for substantially the same reasons that it failed to prevail in the subject matter jurisdiction context. Section 7(h) purports to limit Defendants' liability "pursuant to this Section 7" to "the asset value of the Account on any date that the acts or omissions giving rise to the claim for indemnification shall have occurred." FAC Ex. A § 7(h). As discussed in Part I, *supra,* the Defendants' reading would render section 7(g), which provides for post-termination indemnification, meaningless. "[A] construction which makes a contract provision meaningless is contrary to basic principles of contract interpretation." *Columbus Park Corp. v. Dep't of Hous. Pres. and Dev. of City of N.Y.*, 80 N.Y.2d 19, 31 (1992). A reasonably intelligent person could read section 7(h) as applying only to indemnification during the course of the transactions at issue. It is not unambiguously clear from the language of subsection 7(h) that the parties intended it to render meaningless the immediately preceding subsection. *See Innophos v. Rhodia, S.A.*, 10 N.Y.3d 25, 29 (2008) ("'[T]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent.'") (quoting *Greenfield*, 98 N.Y.2d at 569). Accordingly, at this stage of the litigation the Court cannot conclude that section 7(h) necessarily precludes all recovery.

### 2.   The IMA may provide for indemnification for inter-party suits.

Defendants next assert that the IMA provides for indemnification only for third-party

proceedings, not for lawsuits between the parties.  "Under New York law, 'the court should not

infer a party's intention'" to extend a general indemnification duty to cover actions between the

parties. *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003) (quoting

*Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492 (1989)).  "'[W]hen a party is

under no legal duty to indemnify, a contract assuming that obligation must be strictly construed

to avoid reading into it a duty which the parties did not intend to be assumed.'" *Tonking v. Port

Auth. of N.Y. and N.J.*, 3 N.Y.3d 486, 490 (2004) (quoting *Hooper*, 74 N.Y.2d at 491).  "On the

other hand, neither the *Hooper* holding nor anything in the [laws of New York] *prohibits* such

indemnification, and courts applying New York law have awarded such indemnification."

*Happy Kids, Inc. v. Glasgow*, No. 01-CV-6434(GEL), 2002 WL 72937, at *3 (S.D.N.Y. Jan. 17,

2002) (emphasis in original); *see, e.g., Sagittarius Broad. Corp. v. Evergreen Media Corp.*, 243

A.D.2d 325, 326 (1st Dep't 1997).  "The Court must read the indemnification provision in

conjunction with all other provisions in the agreement to avoid inconsistencies or an

interpretation which would render another provision superfluous or without effect." *Promuto v.

Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 650 (S.D.N.Y. 1999).

Defendants offer two arguments in support of their assertion that any indemnification

provision does not cover inter-party suits.  First, Defendants point out that section 7(d) refers to

the possibility that Plaintiffs would be assessed "fines and penalties" or might plead *nolo

contendere*, language that clearly contemplates the possibility of reimbursement as against

government action.  Br. at 23-24 (citing FAC Ex. A § 7(d)).[9]  Certainly these provisions establish

---

[9]     In its entirety, section 7(d) provides:

that this is a case in which the parties anticipated that there could be third-party claims (presumably they were most concerned about the United States government).  The fact that the parties anticipated the possibility of third party claims is not dispositive of whether the parties also intended for the indemnification provision "to apply to actions of any kind or nature, including actions between the parties."  *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 178-79 (2d Cir. 2005) (Sotomayor, J.).[10]

Second, Defendants argue that the language in the IMA does not unmistakably apply to inter-party suits.  Admittedly, there is no language in section seven than applies *only* to suits between the parties, *cf. Promuto*, 44 F. Supp. 2d at 652, and no limited indemnification provision against which this more expansive provision can be compared, *cf. Mid-Hudson Catskill*, 418 F.3d at 178.  Nevertheless, the intent of the parties that Plaintiffs would not be liable for their own costs as against Defendants is evident from the entirety of the transaction and from the text

---

To the fullest extent permitted by law, the [Defendants] shall indemnify and save harmless the [Plaintiffs] . . . ("the Indemnitees"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the [Defendants] or the performance by the Indemnitee of [their] responsibilities hereunder and against all taxes, charges, duties or levies incurred by the [Plaintiffs] in connection with the purchase of sale or ownership of the [Defendants'] Account, provided that an Indemnitee shall be entitled to indemnification hereunder only if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the [Defendants] and the Indemnitee's conduct did not constitute willful misconduct, gross negligence, a violation of applicable securities laws or criminal wrongdoing.  The termination of any proceeding by settlement, judgment, order or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that an Indemnitee did not act in good faith and in a manner that the Indemnitee reasonably believed to be in or not opposed to the best interests of the Client or that the Indemnitee's conduct constituted willful misconduct, gross negligence, a violation of applicable securities laws or criminal wrongdoing.

FAC Ex. A § 7(d).

[10]  This is not to say that it is irrelevant that the contract contemplated actions brought by third parties – this ratchets up the necessary showing that the parties *also* intended to include inter-party suits.  *See, e.g., Luna v. Am. Airlines*, 769 F. Supp. 2d 231, 244 (S.D.N.Y. 2011).  There is no reason, however, why contracting parties cannot demonstrate the clear intent to indemnify a party against both third-party and inter-party claims.  *See, e.g., Happy Kids*, 2002 WL 72937, at *3.

of the section as a whole.  First, the IMA repeatedly and "[t]o the fullest extent permitted by law" provides that Plaintiffs cannot be liable to the Defendants.  FAC Ex. A § 7(a); *see also id.* § 7(b).  Second, in describing its indemnification provision, the IMA (again "[t]o the fullest extent permitted by law," *id.* § 7(d)), provides that Defendants will reimburse Plaintiffs for all costs associated with "investigating or defending against *any claim* or alleged claim, of *any nature* whatsoever," *id.* (emphasis added).  The authors of these provisions indicated, in close proximity, that Plaintiffs could not be liable to Defendants and that Defendants would cover Plaintiffs' legal fees for *all* claims arising from the tax shelter transactions (to the fullest extent permitted by law).  The Court could plausibly infer the authors' unmistakably clear intent that section seven of the IMA provide for indemnification for inter-party suits.  *Accord Crossroads ABL LLC v. Canaras Cap. Mgmt., LLC*, 105 A.D.3d 645, 645-46 (1st Dep't 2013); *Happy Kids*, 2002 WL 72937, at *3; *see also Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.") (citation omitted).

### 3. Defendants cannot escape their obligation to advance costs by pleading fraud.

Defendants next argue that the IMA's indemnification provision is inapplicable because the Illinois action alleges fraud.  Br. at 24-25 (citing FAC Ex. C ¶¶ 137, 141).  There is no real dispute that the allegations in the Illinois action, if proven, would be sufficient to nullify Defendants' indemnification obligations.  But this Court cannot simply assume that the allegations made in Defendants' pleadings in Illinois state court are true.  *See, e.g., Leonard F. v. Isr. Discount Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999).  Moreover, the IMA contains a specific provision requiring Defendants to advance Plaintiffs money "in defense or settlement of any claim that shall be subject to a right of indemnification," provided that Plaintiffs must "repay

the amount advanced to the extent that it shall be determined ultimately that [they are] not entitled to be indemnified." FAC Ex. A § 7(e). The fact that Defendants pled fraud in Illinois does not limit their duty to advance costs; dismissal on this ground would therefore be premature. The duty to defend is not coextensive with the duty to indemnify; limitations on Defendants' ultimate liability do not necessarily affect their obligation to advance costs. *See, e.g., Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co.*, 16 N.Y.3d 257, 264 (2011) (the "duty to defend is liberally construed and is broader than the duty to indemnify, in order to ensure an adequate defense of the [Indemnitee],' without regard to the [Indemnitee's] ultimate likelihood of prevailing on the merits of a claim") (quoting *General Motors Acceptance Corp. v. Nationwide Ins. Co.*, 4 N.Y.3d 451, 456 (2005)) (alterations omitted).

### 4. The IMA does not contain a covenant not to sue.

Finally, Defendants challenge Plaintiffs' assertion that the IMA contains a covenant not to sue. The specific language that Plaintiffs allege constitutes a covenant not to sue provides: "[t]o the fullest extent permitted by law, [Defendants] shall indemnify and save harmless [Plaintiffs] . . . (the 'Indemnitees'), from and against any and all claims . . . ." FAC Ex. A § 7(d). This language clearly constitutes an indemnification provision. It is limited, however, to cases in which Plaintiffs' "conduct did not constitute willful misconduct, gross negligence, a violation of applicable securities laws, or criminal wrongdoing." *Id.* The IMA also specifically disclaims Plaintiffs' liability to Defendants "[t]o the fullest extent permitted by law," again subject to the same limitations. *Id.* § 7(a).

Read together, these subsections provide that Defendants may sue Plaintiffs, but they cannot collect damages and will be liable for all costs associated with Plaintiffs' defense of the

lawsuit *unless they are able to prove fraud or Plaintiffs' bad faith*.[11]  *Cf. Schneider v. Revici*, 817 F.2d 987, 993-94 (2d Cir. 1987); *Bridgeport Music, Inc. v. Universal Music Grp.*, 440 F. Supp. 2d 342, 345-46 (S.D.N.Y. 2006).  Insofar as the FAC asserts a claim for breach of the IMA's covenant not to sue, *see* FAC ¶ 35, that claim is dismissed.

### B.  Second and Third Causes of Action – Breach of the Subscription Agreement

Defendants move to dismiss Plaintiffs' claims under the Subscription Agreement for two reasons, neither of which is persuasive.  First, they argue that the Subscription Agreement does not incorporate the IMA by reference, as it incorporates only documents "delivered by the Subscriber [Cary Investments] to the [Gramercy Global Recovery] Fund."  FAC Ex. B ¶ 4. Defendants argue that, because they delivered the IMA to Gramercy *Advisors*[12] (not Gramercy Global Recovery Fund), it is not incorporated into the Subscription Agreement.  Br. at 18-19. This argument overlooks the fact that Gramercy Advisors was the Sole Manager of Gramercy Global Recovery Fund.  Lanava Decl. Ex. C ¶ 1.35.  Delivery to its sole manager constitutes delivery to the Fund.[13]

Second, the Defendants challenge the description of section four of the Subscription Agreement as a "covenant not to sue."  Br. at 25-28.  For the reasons discussed in Part V(A)(4), *supra*, the Court agrees with this argument.  Section four constitutes an indemnification agreement, not a covenant not to sue.  After the dust clears, if the Defendants' Illinois action is

---

[11]     The Court is aware that this reading yields the same practical result as finding the IMA contains a covenant not to sue except in cases of fraud or bad faith – the Court's reading, however, is supported by the language in the parties' contract.

[12]     Defendants' brief alternates between referring to Gramercy Advisors, which was a party to the IMA, and "Gramercy Investments," which does not appear to be a relevant entity.  Br. at 18-19; *see* FAC Ex. A.

[13]     Defendants' temporal argument, advanced only in their reply brief, is also unpersuasive.  That Cary Investments was not yet a member of the Fund did not preclude it from delivering a document to the Fund or preclude the Fund's Sole Manager from accepting delivery from it.

within the category of complaints for which they have promised to indemnify the Plaintiffs, then they will owe the Plaintiffs all of the costs described in section four.  If not, then they are within their rights to file suit.

### C.  Fifth Cause of Action – Specific Performance

Finally, Defendants challenge Plaintiffs' fifth cause of action for specific performance. Br. at 30.  This cause of action is pled as an alternative to the breach of contract claims, presumably on the theory that if the Court finds that Defendants have an indemnification obligation but are not yet in breach of it, the Court should order them to comply with it. Defendants assert that the Plaintiffs do not sufficiently plead that they lack an adequate remedy at law.  Plaintiffs' "adequate remedies at law" are their breach of contract claims.  It is, however, permissible to plead specific performance and breach of contract claims in the alternative.  *See, e.g., Richmond Shop Smart, Inc. v. Kenbar Dev. Ctr., LLC*, 32 A.D.3d 423, 423-24 (2d Dep't 2006).

## CONCLUSION

For the forgoing reasons, Defendants' motion to dismiss is DENIED in part and GRANTED as to Plaintiffs' allegations of breach of a covenant not to sue.  Defendants' motion to exclude portions of the Lanava Declaration is DISMISSED as moot – the Court did not consider the three challenged paragraphs.  The Clerk of the Court is respectfully directed to terminate Dkt. 34 and Dkt. 52.

**SO ORDERED.**

**Date:  August 25, 2014**                                  **VALERIE CAPRONI**
**New York, New York**                               **United States District Judge**

23